UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JANAE L. HARRINGTON,

        Plaintiff,

v.                                             CASE NO. 3:20-cv-337-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). Following an administrative hearing held on June 25, 2018, at which Plaintiff proceeded without the assistance of an attorney or other representative, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from October 15, 2014, the alleged disability onset date, through October 19, 2018, the date of the ALJ's

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 17.)

decision.[2]  (Tr. 29-41, 109-30.)  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must consider both evidence that is favorable and evidence that is unfavorable to the decision.  *Foote v.*

---

[2] Plaintiff had to establish disability on or before September 30, 2016, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 30; *but see* Tr. 232 (listing September 30, 2015 as the date last insured).)

2

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

### A.   The Parties' Arguments

Plaintiff raises two issues on appeal.  First, she argues that the Appeals Council erred in failing to adequately consider new and material evidence in the form of: (1) imaging reports and treatment records for Plaintiff's right shoulder and right knee impairments from William A. Ciszewski, M.D. at Westside Orthopaedic Group for the period of August 7, 2013 through October 30, 2018; and (2) opinion evidence, dated February 14, 2019, from Plaintiff's therapist, Jessica Montalbano, LMFT with Unity Mental Health Pinewild.  (Doc. 24 at 13-15.)  Plaintiff explains:

> Not only did the Appeals Council fail to include in its rejection of this evidence any explanation, especially with regard to the opinion evidence contained therein, but also this evidence directly undermined the ALJ's [residual functional capacity ("RFC")], it left the RFC unsupported by substantial evidence, and it related to the period at issue with regard to Plaintiff's physical and mental ability to perform work at substantial gainful activity.
> . . .
> [T]he addition of these records fills [the] gap [in the record] and bolsters Plaintiff's subjective complaints of disabling physical impairments, [as] Plaintiff appeared pro se at the hearing, which heightened the ALJ's duty to develop the record, and he failed to develop the record for this evidence, and when Plaintiff obtained

counsel after the hearing, these records were obtained and submitted.

(*Id.* at 13-14, 16.)  Plaintiff adds that the ALJ did not even consider her right

knee impairment at step two of the sequential evaluation process[3] because he

never mentioned it.  (*Id.* at 15.)

Second, Plaintiff argues that the ALJ improperly based his RFC

assessment on his own lay interpretation of raw medical data, which the ALJ

was not qualified to do, considering Plaintiff's complex physical and mental

impairments.  (*Id.* at 19, 21.)  Plaintiff adds that since there was no opinion

evidence in the record, the ALJ needed to develop the record by obtaining

opinion evidence or a functional assessment either from a treating source,

from a consultative examiner, or from a medical expert.  (*Id.*)  Plaintiff

explains:

> Despite this duty [to develop the record], the ALJ failed to obtain
> any opinion evidence, despite the clear evidentiary gaps which
> resulted in unfairness and clear prejudice, as substantial
> evidence upon which the ALJ could base the RFC and disability
> determination did not exist in the record.  It should also be noted
> that it appears as though the ALJ recognized that the record was
> deficient of at least some treatment records, specifically from
> Plaintiff's primary care provider, Dr. Jenkins, but the ALJ
> erroneously requested records from "Dr. Jennings" at Rochester
> Regional Health and failed to verify the provider when a letter
> was returned stating that "Dr. Jennings" was not a provider at
> the facility.[4]  (Tr. 523-530).  The records the ALJ did have

---

[3] The Commissioner employs a five-step process in determining disability.
*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[4] *See* Tr. 529 ("The doctor requested is not a provider at this facility.").

repeatedly referenced Plaintiff's primary care provider as Dr. Jenkins, so a review of the records should have informed the ALJ who to request records from, but he failed to request such records or otherwise develop the record for these, Plaintiff's orthopaedic treatment records, or any opinion evidence.

(Doc. 24 at 22-23.)

Defendant responds that the Appeals Council properly considered the new evidence submitted by Plaintiff and found that it did not merit remand because there was not a reasonable probability that it would change the outcome.  (Doc. 25 at 2.)  Defendant explains that the Appeals Council did not need to provide a detailed explanation as to how it weighed the evidence. (*Id.*)  According to Defendant, the new evidence served to further support the ALJ's decision.  (*Id.* at 15.)

As to the second issue on appeal, Defendant asserts that the ALJ did not need a medical opinion to assess the medical evidence.  (*Id.* at 1.) Defendant explains that the ALJ properly evaluated the evidence to arrive at the RFC by relying on Plaintiff's daily activities, relatively mild objective findings, and lack of allegations of physical limitations.  (*Id.*)  Defendant argues that the ALJ was not required to seek additional evidence because there was no ambiguity in the record.  (*Id.* at 13.)  Defendant concedes that the Commissioner's request for records misidentified Dr. Jenkins as "Dr. Jennings," but states that "the request sought all of the records from the Rochester Regional Health facility (Tr. 525)," showing that "the

Commissioner took reasonable steps to develop the record."  (Doc. 25 at 13.)

Defendant adds that "while Plaintiff submitted additional records to the

Appeals Council, she did not submit any treatment notes from Dr. Jenkins"

and "failed to show prejudice stemming from the lack of treatment records

from Dr. Jenkins."  (*Id.* at 13-14.)

## B.    Relevant Evidence

### 1.    Evidence Available to the ALJ

#### a.    Physical Impairments

The evidence that was submitted to the ALJ regarding Plaintiff's

physical impairments included the following.

On April 25, 2016, Dr. Ciszewski performed an arthroscopic Bankart

repair on Plaintiff's right shoulder.  (Tr. 310.)

On June 8, 2017, Plaintiff's primary care physician, Chrystal Jenkins,

M.D., completed a medical report form for ACCESS-VR, noting that Plaintiff

complained of shoulder pain, restricted range of motion, and difficulty lifting

heavy items with her right arm due to the shoulder repair, and also struggled

with stressful situations and social interactions.  (Tr. 306.)  The findings from

her most recent June 6, 2017 examination showed a mildly restricted range

of motion.  (*Id.* (also noting that Plaintiff was anxious and avoided eye

contact).)  Plaintiff's diagnoses included: moderate persistent asthma, rotator

cuff syndrome on the right, gastroesophageal reflux disease ("GERD"),

generalized anxiety disorder ("GAD"), and attention deficit hyperactivity disorder ("ADHD").  (Tr. 307.)  Plaintiff's reported disabilities included post-right-shoulder repair and asthma.  (Tr. 306.)  The physical limitations stemming from her disabilities included no heavy lifting and avoiding repetitive motions, stressful social interactions, and dust/fumes.  (Tr. 307.) Dr. Jenkins added that Plaintiff "would struggle with anxiety/panic if in public [transportation], but [she was] managing somewhat." (*Id.*)

On June 15, 2017, Plaintiff presented to the emergency department with shortness of breath and was discharged on June 18, 2017 in a stable condition.  (Tr. 313-24.)

On January 29, 2018, Plaintiff underwent a right knee arthroscopic extensive synovectomy.  (Tr. 333.)

In March of 2018, on an ACCESS-VR form, Plaintiff reported disability due to a knee impairment.  (Tr. 301.)

### b.    Mental Impairments

On December 7, 2015, Plaintiff saw Carol A. Coy, NPP-C at Unity Mental Health Pinewild.  (Tr. 287.)  Plaintiff stated she wanted to get back on Wellbutrin.  (*Id.*)  She reported low mood with difficulty getting out of bed some mornings and anxiety when getting out of the house.  (*Id.*)  She also reported drinking more alcohol and intermittent marijuana use.  (*Id.*)  Her mood was anxious and depressed at times, affect was anxious, insight was

superficial, and judgment was fair.  (Tr. 289.)  She was diagnosed with a depressive disorder, not otherwise specified; alcohol abuse; cannabis abuse; attention deficit disorder ("ADD"); anxiety disorder, unspecified; and borderline personality disorder.  (*Id.*)

On December 9, 2015, Plaintiff saw her therapist, Ms. Montalbano, for individual therapy.  (Tr. 283.)  She was diagnosed with cannabis abuse, uncomplicated; alcohol abuse, uncomplicated; other recurrent depressive disorders; GAD; ADHD, predominantly inattentive type; and borderline personality disorder.  (*Id.*)  Plaintiff inquired about group therapy due to a recent experience of increased anxiety related to past trauma from March of 2015.  (*Id.*)  She reported occasional marijuana use and reduced alcohol use and acknowledged their impact on her symptoms.  (Tr. 283-84.)  Plaintiff's mental status was normal except for her anxious mood and affect and distractible cognition.  (Tr. 284.)

 On January 13, 2016, Plaintiff returned to Ms. Montalbano for individual therapy.  (Tr. 382.)  Her affect was anxious, but she was future focused and motivated for school and for her daughter.  (Tr. 383-84.)  On January 13, 2016, Plaintiff also saw Ms. Coy.  (Tr. 398.)  She reported doing fine with her current medications, but had difficulty leaving the house some days due to excessive worry.  (*Id.*)

On January 19, 2016, Plaintiff returned to Ms. Montalbano for

individual therapy.  (Tr. 378.)  She had anxious mood and affect, pressured/rapid speech, and intermittent eye contact.  (Tr. 379.)  The focus of the session was reducing her anxiety and creating a plan to help her clean her house.  (Tr. 378.)

On January 28, 2016, Plaintiff had another individual therapy session with Ms. Montalbano.  (Tr. 374.)  She reported being "more productive and less anxious at home."  (*Id.*)  The focus of the session was her decision to not return to school that semester and to increase her coping skills, explore jobs, and socialize.  (*Id.*)  During the next individual therapy session with Ms. Montalbano on February 4, 2016, Plaintiff's mental exam was normal except for her anxious affect.  (Tr. 371.)

On February 23, 2016, O. Fassler, Ph.D. noted in a Psychiatric Review Technique ("PRT") form that there was insufficient evidence to substantiate the presence of a mental disorder.  (Tr. 134.)

On February 25, 2016, Plaintiff saw Ms. Montalbano for individual therapy.  (Tr. 365.)  She had anxious mood and affect and intermittent eye contact.  (Tr. 366.)  She reported efforts to stop smoking.  (*Id.*)  During her next individual therapy visit on March 3, 2016, Plaintiff reported progress in many areas, including getting back into a routine, completing a YMCA application, and cleaning her home.  (Tr. 361.)  Due to continued anxiety symptoms, Plaintiff was told to continue in weekly group and individual

therapy sessions.  (Tr. 362.)  When she saw Ms. Montalbano on March 24,
2016, she had anxious mood and affect due to her mother and stepfather
coming to visit.  (Tr. 357-58.)

On April 14, 2016, Plaintiff reported to Ms. Montalbano that she was
overwhelmed and anxious due to a recent move.  (Tr. 353.)  On examination,
her mood and affect were anxious.  (Tr. 354.)  On April 19, 2016, Plaintiff saw
Ms. Coy for anxiety.  (Tr. 394.)  She did not feel Concerta was working and
asked to increase the dose of Wellbutrin.  (Tr. 394, 396.)  She stated that she
took a semester off from school.  (Tr. 394.)  When Plaintiff returned to Ms.
Montalbano on April 21, 2016, she felt less anxious and was preparing for her
shoulder surgery the following week.  (Tr. 349.)

On May 10, 2016, Plaintiff told Ms. Montalbano that she was
"recovering well from shoulder surgery and [was] going to start [physical
therapy] soon."  (Tr. 345.)  At the next individual therapy session with Ms.
Montalbano on May 18, 2016, Plaintiff was anxious, overwhelmed, and
scattered in thought.  (Tr. 341.)  She reported "feeling pressure to look for a
job, and has been looking . . . , as well as thinking about moving[,] and has
not [completed] chores at home."  (*Id.*)  Plaintiff also reported not taking her
medication during the past week due to taking pain medication, which had
impacted her symptoms, and planned to restart it as she was done with the
pain medication.  (*Id.*)  She had anxious mood and affect, distractible

cognition, tangential thought form, and average eye contact.  (Tr. 342.)

On June 1, 2016, Plaintiff saw Ms. Coy.  (Tr. 390.)  She was "[f]ocused on wanting to further herself with a job and getting out of the neighborhood" and was "[l]ooking to go back to school in the [f]all and [to take a] possible online class [that] summer."  (*Id.*)  She was asked to continue with behavioral strategies, such as making lists, to keep organized.  (Tr. 393.)

On October 21, 2016, Plaintiff saw Ms. Montalbano for anxiety and problems with concentration.  (Tr. 402.)  Ms. Montalbano noted:

> Client reports she has wanted to attend appointments but has been focused on school, taking 4 classes.  She reports doing well in most classes and reflects on time management and time she spends on homework to try to be successful.  Reports struggling to manage other areas of life, reporting she missed appointments, dropped out of [physical therapy] and has been behind in housework and paperwork.

(Tr. 403.)

On November 4, 2016, when Plaintiff returned with the same issues (*see* Tr. 406), Ms. Montalbano noted:

> Client continues to report difficulty managing paperwork, appointments and housework or other tasks.  She is primarily focused on school[]work and reports doing well at this [sic].  Client is receptive to interventions aimed to address re[-]framing thoughts, as she reports putting pressure on herself for not doing other tasks.

(Tr. 407.)  At the next session on November 18, 2016, Plaintiff presented with anxious mood and affect.  (Tr. 412.)  She reported "gains in organizing house

11

and feeling she has managed workload at school." (Tr. 411.)

On December 2, 2016, Plaintiff's examination was normal, despite reporting anxiety and lack of concentration to Ms. Montalbano. (Tr. 414-16.) Plaintiff reported missing school due to worry about disability paperwork and not getting her rent paid. (Tr. 415.)

During the session with Ms. Montalbano on January 12, 2017, Plaintiff appeared anxious and avoided eye contact at first. (Tr. 419.) "She reported feeling stressed by schoolwork and trying to complete the semester . . . as she ha[d] a pattern of struggling with completing semesters." (*Id.*) Plaintiff returned to Ms. Montalbano on January 20, 2017 for depression, anxiety, and lack of concentration. (Tr. 423-24, 426.) On February 10, 2017, she reported trouble sleeping and feeling tired after school. (Tr. 428.)

On March 3, 2017, Plaintiff told Ms. Montalbano that she was struggling with college and managing a routine to accomplish tasks and homework, but felt she was getting back on track. (Tr. 433.) On April 4, 2017, an examination by Ms. Montalbano showed that Plaintiff had anxious mood and affect and tangential, disorganized coherency. (Tr. 438.) She returned on April 18, 2017 for anxiety and lack of concentration. (Tr. 440-41.)

On May 25, 2017, Plaintiff again presented with anxiety and lack of concentration. (Tr. 444-45.) Ms. Montalbano noted:

> [Patient] [r]eports things have been "going well." She has been working at Foodlink for WEP 3 days per week. Reports feeling positive about managing things and has daughter signed up for summer camp. Does report struggle with organization and follow[-]through with tasks, sharing she has forgotten to bring paperwork needs [sic] by [A]ccess-VR, follow up with care manager and access-VR services, which has been [a] pattern for client with disorganization.

(Tr. 445-46.)

On June 2, 2017, Plaintiff reported to Ms. Montalbano that she was "feeling positive about [A]ccess-VR but was struggling to organize and follow up on referral." (Tr. 451.) On June 27, 2017, Ms. Montalbano noted that Plaintiff had anxious mood and affect and mild confusion, but otherwise normal examination. (Tr. 456.) On June 27, 2017, Ms. Montalbano completed a treatment report form for Access-VR, noting that Plaintiff was struggling with work/home organization and functioning.[5] (Tr. 304.)

On July 31, 2017, Ms. Montalbano reported that Plaintiff appeared "more euthymic in mood and less dysregulated than on the phone." (Tr. 461.) She had stopped her medication the previous day. (*Id.*)

On September 8, 2017, Plaintiff reported to her therapy session with Ms. Montalbano ten minutes late and stated she continued to struggle with timeliness and organization. (Tr. 466.) She had anxious mood and affect, but felt positive about her routine and starting electrician training the following

---

[5] Page 3 of the form seems to be missing.

week.  (*Id.*)  During the September 22, 2017 visit with Ms. Montalbano,
Plaintiff's examination was normal except for her anxious mood and affect.
(Tr. 471.)  On October 6, 2017, Plaintiff's examination was unremarkable.
(Tr. 476.)  She reported rug-hooking for a hobby and spending time with her
boyfriend and his family.  (*Id.*)  On October 20, 2017, Plaintiff reported to Ms.
Montalbano that school was going well, and she was confident in managing
tasks, even being ahead in her projects.  (Tr. 481.)

On November 3, 2017, Plaintiff asked Ms. Montalbano to end the
"session early due to wanting to return to school and felt she 'got what [she]
needed' from [the] therapy session."  (Tr. 486.)  On December 14, 2017,
Plaintiff's examination was unremarkable, despite complaining of depression,
anxiety, and lack of concentration.  (Tr. 489-92.)  On January 26, 2018,
Plaintiff saw Ms. Montalbano and reported feeling better after restarting her
medication.  (Tr. 495.)  Her examination was generally unremarkable.  (Tr.
496.)

On April 13, 2018, Plaintiff's examination was again generally
unremarkable.  (Tr. 500.)  Ms. Montalbano noted:

> Client reports she has been back to school and life after
> recovering from knee surgery.  Reports she is doing well at school
> and is hopeful about future jobs . . . .  Reports mood has been
> more stable and feels she has been getting up easier in the
> morning and attending [appointments] on time.  Continues to
> report some struggle with making consistly [sic] schedule . . . and
> continues to struggle with organization/cleanliness at home.  . . .

> Also reviewed substance use with client, after she made comment
> about making plans to clean house and stating "maybe ill [sic] get
> a beer and will clean" and states she "cleans better after
> drinking." . . . Client also asked for copy of medical record at
> [the] end of session, and after therapist used questions to explore
> her motivation behind [her] request, shared she has upcoming
> [Social Security Disability] hearing and needs records for this,
> but felt stigma around this so has not been open with therapist.

(Tr. 499-500.)

On April 25, 2018, Plaintiff saw Andrew C. Marcy, NP for psychiatric medication refill.[6]  (Tr. 503.)  Plaintiff's diagnoses at this visit were cyclothymia, GAD, and adult ADD with hyperactivity.  (Tr. 506.)  She had mild confusion and distractible concentration/attention, but otherwise generally normal mental status exam.  (Tr. 504.)  Plaintiff reported her anxiety had been manageable and she had only six weeks of electrical training left.  (Tr. 503.)  She was taking Abilify and Vyvance regularly.  (*Id.*) The provider added:

> [Patient] [h]as been on several SSRI's [selective serotonin
> reuptake inhibitors] in the past.  Tends to report feeling either
> sedated by them (especially if they typically result in increased
> energy[,] i.e. Fluoxetine or [W]elbutrin) or expresses feeling more
> irritable.  Reports some history of irritability and impulsivity
> along with some cyclical increases in risk[-]taking behaviors.
> Became paranoid on [L]estexamphetamine 40 mg.  Will change
> diagnosis to cyclothymia.
> Good response to [L]amotrigine[,] however[,] client does not feel it
> was robust enough and requests change[,] which is indicated.
> Will attempt Abilify.
> Positive response to [A]bilify but with some sedation and weight

---

[6] This provider indicated he was leaving the clinic in July of 2018.  (Tr. 507.)

gain.  Sedation has resolved and weight is steady.

(Tr. 507.)

On May 11, 2018, Plaintiff saw Ms. Montalbano for individual/family therapy to address her depression, anxiety, and lack of concentration.  (Tr. 508, 511.)  Her diagnoses were cyclothymia, GAD, and adult ADD with hyperactivity.  (*Id.*)  Plaintiff reported she stopped Abilify on May 6, 2018, because she "felt tired and struggled with energy and making it to school."  (Tr. 509.)

On June 25, 2018, Plaintiff returned to Ms. Montalbano and reported being "overwhelmed and having trouble focusing or attending to tasks, since being off medication," which she had reportedly lost.  (Tr. 514.)  After Ms. Montalbano reinforced medication compliance, Plaintiff "indicated she would take [it] as prescribed after [her] upcoming [appointment] with [the] provider [that] week."  (*Id.*)  On examination, Plaintiff exhibited anxious mood and affect and helplessness.  (Tr. 515.)

On June 28, 2018, Plaintiff saw Matthew E. Kilthau, M.D. for the first time.  (Tr. 518.)  She reported anxiety, but her examination was unremarkable.  (Tr. 518-20.)  The encounter diagnosis was ADHD, unspecified type.  (Tr. 518, 520.)  Dr. Kilthau noted:

> [Patient] reports losing her [V]yvanse pills 2 weeks ago and since [then she has] been more disorganized, staying in bed, [with] poor focus, [and has] called her professor and stopped going to

16

electrical school. . . . Panic attacks continue. Reviewed prior med[ication] trials, she didn't like [P]rozac and [Z]oloft, there was another med[ication] she felt was helpful but doesn't remember [the] name[.]

(Tr. 518.)

### c.   Hearing Testimony

Plaintiff appeared *pro se*[7] at the June 25, 2018 hearing before the ALJ. (Tr. 111.) Plaintiff testified, in relevant part, that she underwent surgery on her right knee on January 29, 2018 and on her right shoulder in 2016. (Tr. 117-18.) Plaintiff also testified that she was taking medication for her mood disorder and ADHD. (Tr. 118.)

The problems preventing Plaintiff from working, in her own words, were mostly the difficulty interacting with people and keeping up with documentation, especially if she did not have her medication. (Tr. 123.) Without her medication, she could not deal with school, had difficulty getting up in the morning and "getting things done in the house," and felt "very lethargic" and "very spacy." (Tr. 125.)

Plaintiff stated that she was hoping to finish her "class and try to find employment as an electrician." (Tr. 124.) She explained that the training entailed "a lot of hands on work," including bending conduit, putting up and

---

[7] Plaintiff was represented by counsel at the time of her appeal to the Appeals Council. (*See* Tr. 281-82.)

17

twisting wires, and "a lot of squatting and kneeling which [could] be difficult on [her] knee." (*Id.*)

At the end of the hearing, the ALJ stated that he was going to obtain medical records that were missing, including records from "Dr. Jennings," records from Unity Mental Health, records from Access-VR, and "all the records from Unity Hospital because [claimant] had [her] knee surgery and [her] shoulder surgery there."[8]  (Tr. 128-29; *see also* Tr. 279.)

### 2.    Evidence Submitted to the Appeals Council

### a.    Physical Impairments

On January 9, 2015, Dr. Ciszewski submitted a letter to Plaintiff's referring physician, Dr. Jenkins, which stated, in relevant part:

> The patient is 25-years old, right[-]hand dominant and referred
> for evaluation of right shoulder and right knee pain.  She states
> that the right shoulder pain began in 2006 while playing tennis.
> . . .  She has not attended therapy.  She does not use a brace and
> has not been instructed in home exercises.  Her main complaint
> is limited [range of motion], chronic pain and sense of instability
> in the right shoulder.
>
> With regard to the right knee, that pain began about 3 years ago
> while playing racquetball.  . . .  She has not attended therapy.
> She has not been braced with regard to the right knee.  Currently
> she is in school studying network systems at Bryant & Stratton.

(Tr. 65.)

---

[8] In her Request for Hearing by an ALJ, dated April 21, 2016, Plaintiff stated that she was having her shoulder surgery on April 25, 2016 and had additional evidence to submit.  (Tr. 143.)

On physical examination, Plaintiff had "passive forward flexion to 90 degrees," "palpable snap along the anterolateral aspect of the shoulder which cause[d] apprehension," "a 3/5 external muscle strength," "2/5 abduction strength," limited internal rotation, a mildly swollen right knee, "[m]aximum tenderness laterally with a positive lateral McMurray sign," and a mildly antalgic gait.  (Tr. 66.)  Dr. Ciszewski's impression was: (1) right shoulder possible labral tear, possible impingement; and (2) right knee possible lateral meniscal tear.  (*Id.*)  Plaintiff stated she wanted "'definitive treatment' for her shoulder and knee so that she [could] become more active again."  (*Id.*)  In the meantime, Dr. Ciszewski asked Plaintiff to avoid pivoting and twisting activities and any competitive upper extremity sports.  (*Id.*)

On March 4, 2016, Plaintiff returned to Dr. Ciszewski due to continued discomfort in her right shoulder and right knee.  (Tr. 67.)  Dr. Ciszewski noted that Plaintiff "never underwent right shoulder or right knee MRI when she was last seen here in January 2015."  (*Id.*)  On examination, Plaintiff seemed to have anterior subluxation of the glenohumeral joint of the right shoulder, her right knee was mildly swollen anterolaterally, she had "increasing pain in the lateral joint line, worsened with internal and external rotation of the knee," and she seemed to have a lateral McMurray's sign.  (*Id.*)  The impression was:

1.  Right shoulder clinical history and evidence of instability.

Cannot rule out a Bankart lesion.
2. Right knee possible lateral meniscal tear.

(*Id.*) Dr. Ciszewski asked Plaintiff to avoid competitive type sports. (*Id.*)

On March 17, 2016, Plaintiff underwent a right shoulder injection under fluoroscopic guidance. (Tr. 69.) The same day, she also underwent an MRI of the right shoulder and an MRI of the right knee. The MRI of the right shoulder showed tearing of the anterior, inferior labrum. (Tr. 72.) The MRI of the right knee showed tearing of the posterior horn of the medial meniscus and chronic complete tear of the anterior cruciate ligament. (Tr. 70.)

On March 23, 2016, Plaintiff returned to Dr. Ciszewski for review of the MRI results. (Tr. 74.) The examination revealed:

> The right shoulder is nonswollen, nonerythematous, and not grossly deformed. Active abduction [sic] 90 degrees and forward flexion to 130 degrees. External rotation to 30 degrees. She has what appears to be a positive apprehension sign when the shoulder is abducted and external [sic] rotated.

> The right knee is minimally swollen. Range of motion from 3 degrees short of full extension to flexion of 130 degrees. . . . She does have pain along the medial and lateral joint line. . . .

(*Id.*) Dr. Ciszewski's impression was:

1. Right shoulder inferior instability. MRI evidence of anterior/inferior labral tear.
2. Right knee pain due to ACL tear and medial meniscal tear.

(*Id.*) Dr. Ciszewski stated:

> Clinically[,] the patient states that her right shoulder is more
> symptomatic than the right knee and she would like to have
> definitive treatment of the right shoulder performed.  I did point
> out to the patient that smoking may delay and/or inhibit healing
> of the right shoulder.  . . .
> She indicated an interest in proceeding to surgery for the right
> shoulder and asked that I schedule this some time in April 2016.
>
> With regard to the right knee, she states that symptoms are mild
> to moderate at this time and she can probably "live with it" at
> least for now.  . . .  She states that she is in generally good health.

(Tr. 74-75.)

On April 25, 2016, Plaintiff underwent a right shoulder arthroscopic

Bankart repair and was discharged the same day.  (Tr. 76, 78, 83, 86, 89.)

She was advised to avoid heavy lifting for six weeks.  (Tr. 83.)

On May 3, 2016, Plaintiff reported continued gradual progress in her

right shoulder.  (Tr. 90.)  Dr. Ciszewski noted the right shoulder was mildly

swollen.  (*Id.*)  He recommended:

> [N]o active use of the shoulder yet.  We have discussed some light
> exercises such as pendulum exercises and posterior capsular
> stretching.  She is also permitted to move the elbow, wrist, and
> digits.  No heavy lifting or carrying activities whatsoever.  . . .
> Recovery time usually spans six months to a year.

(*Id.*)

On May 12, 2016, Plaintiff reported moderate symptoms in her right

shoulder, but better overall.  (Tr. 91.)  Plaintiff's examination was normal

except for a 3/5 grip strength and minimal swelling in the right shoulder.

(*Id.*)  Dr. Ciszewski recommended that Plaintiff use a sling when in public

and that she perform gentle stretching exercises, but no lifting or carrying activities. (*Id.*) As Plaintiff had questions about seeking employment, she was told to avoid any heavy repetitive lifting and reaching above the shoulder level. (*Id.*)

On June 2, 2016, Plaintiff reported continued progress in her right shoulder. (Tr. 92.) She stated she wanted to advance to a light duty job at Burger King where she would not be asked to perform repetitive lifting activities. (*Id.*) On examination, her right shoulder was mildly swollen, and she had a 4/5 grip strength in her right upper extremity. (*Id.*) As Plaintiff was doing well clinically, Dr. Ciszewski stated that she could begin a course of physical therapy, including heat, ultrasound, stretching, and strengthening exercises. (*Id.*)

On September 8, 2016, Plaintiff returned to Dr. Ciszewski with continued intermittent discomfort in her right shoulder. (Tr. 95.) Since her last visit, Plaintiff had not attended physical therapy, but had gone back to the gym for some weight-lifting activities and swimming. (*Id.*) On examination, her right shoulder was mildly swollen and there was slight thickening over the anterolateral aspect of the shoulder. (*Id.*) Dr. Ciszewski wrote:

> I explained to the patient that most individuals need 4-6 months for clinical healing. The patient missed her last visit and has not been in touch with us. I did recommend that she resume therapy

and she is willing to try that again.  I have written a new script
for therapy.  I filled out her disability forms for Social Services.
She has returned to school for business and engineering.

. . .  The patient states that she would like to work at this point
and I think[,] provided that she avoids above[-]shoulder reaching
and no lifting over 50 [pounds], she could probably work up to 20
hours per week.

(*Id.*; *see also* Tr. 94 (a prescription by Dr. Ciszewski, dated September 8,

2016, for physical therapy for Plaintiff's right shoulder, twice a week for four

weeks).)

On January 5, 2017, Plaintiff saw Dr. Ciszewski with ongoing

intermittent symptoms in her right shoulder.  (Tr. 97.)  On examination,

Plaintiff's right shoulder was mildly swollen, she had a negative

apprehension sign when the shoulder was abducted and externally rotated,

her external rotation was to about 30 degrees, she had a 4/5 external muscle

strength and 4/5 internal strength in the right shoulder.  (*Id.*)  Dr. Ciszewski

noted:

I did ask her to avoid all above shoulder reaching and carrying
activities and no lifting over 10 pounds for now, at least over the
next six months.  I filled out her disability forms for Social
Services.  I have encouraged her to continue in her school work
[sic].  For now, she will follow up in about two months for a
clinical exam.  I did review some home exercises with her as well.
If she does work out at the gym, I think she should avoid above
shoulder activities but activities such as weight curls for the
biceps and extensions for the triceps are certainly acceptable, as
long as the weights are under 10 pounds.

(*Id.*)  During the same visit, Dr. Ciszewski prescribed physical therapy for

23

Plaintiff's right shoulder, twice a week for four weeks.  (Tr. 96.)

On November 9, 2017, Plaintiff returned to Dr. Ciszewski with right

knee pain.  (Tr. 98.)  The physical examination was normal, except:

> The right knee is mildly swollen medially.  [Range of motion]
> from 5 degrees short of full extension to flexion of 120 degrees.
> Positive medial McMurray sign with guarding.  . . .
> X-rays of the right knee taken today reveal minor early
> degenerative changes in the medial compartment but the joint
> spaces are preserved in three compartments.

(*Id.*)  Dr. Ciszewski stated: "It's quite likely that she has a medial meniscal

tear.  I have recommended that she avoid pivoting and twisting activities.

We will get an MRI to rule out a medial meniscal tear."  (*Id.*)

On December 5, 2017, Plaintiff underwent an MRI of the right knee,

which showed "tears in the posterior horns of both medial and lateral

menisci" and "a chronic ACL tear."  (Tr. 99.)

On December 8, 2017, Plaintiff returned to Dr. Ciszewski with

continued discomfort in her right knee.  (Tr. 100.)  The examination was

normal, except:

> The right knee is noted to be mildly swollen.  . . .  [Range of
> motion] from 5 degrees short of full extension to flexion of 120
> degrees.  She has pain along the medial and lateral joint lines
> today.  . . .

(*Id.*)  The impression was: "Right knee pain due to medial and lateral

meniscal tears.  MRI evidence of an ACL tear.  Clinically[,] the patient does

not demonstrate instability."  (*Id.*)  Dr. Ciszewski noted:

24

> I would not specifically advise an ACL reconstruction based on
> recurrent clinical presentation[,] but because of her chronic
> pain[,] I think she would benefit from an arthroscopic medial and
> lateral meniscectomy. . . .
> The patient indicates that she would like to proceed to surgery
> some time in February during her child's vacation. . . . In the
> mean[]time[,] I have asked her to avoid pivoting and twisting
> activities.

(*Id.*)

On January 29, 2018, Plaintiff underwent right knee arthroscopic extensive synovectomy. (Tr. 102, 104.) Her post-operative diagnosis was no unstable meniscal tears, but extensive synovitis. (Tr. 102.)

On February 9, 2018, Plaintiff returned to Dr. Ciszewski with continued moderate symptoms in her right knee. (Tr. 105.) On examination, her right knee was mildly swollen. (*Id.*) Dr. Ciszewski recommended home stretching exercises and "[n]o work for now." (*Id.*)

On February 23, 2018, Plaintiff returned to Dr. Ciszewski with continued moderate symptoms in her right knee. (Tr. 106.) On examination, her right knee was mildly swollen, "slight warmth palpated," and the range of motion was from 10 degrees short of full extension to flexion of 110 degrees. (*Id.*) Dr. Ciszewski recommended continued home stretching exercises and "[n]o work or school for now." (*Id.*)

On March 12, 2018, Plaintiff again saw Dr. Ciszewski with continued gradual progress in her right knee and was "eager to return to her training

job." (Tr. 107.)  The examination was normal, except: "The right knee [was] mildly swollen. . . .   Range of motion [sic] from 0 degrees of full extension to flexion of 120 degrees."  (*Id.*)  Dr. Ciszewski recommended continued home stretching exercises and filled out her disability forms.  (*Id.*)

On October 30, 2018, Plaintiff returned to Dr. Ciszewski with continued moderate symptoms in her right knee.  (Tr. 108.)  Plaintiff reported some increasing pain and swelling after she started playing basketball.  (*Id.*)  The abnormal examination findings included:

> The right knee is mildly swollen.  There is slight warmth. . . .
> Ambulates with a minimal antalgic gait.  The right knee has
> range of motion from 0 degrees of full extension to flexion of 120
> degrees.  She has some minor discomfort along the medial and
> lateral joint line. . . .
> . . . X-rays of the right knee taken today reveal fairly well
> preserved medial and lateral compartments.  There is narrowing
> of the patellofemoral joint.

(*Id.*)  Dr. Ciszewski stated: "It is possible that she has an overuse synovitis and I have recommended that she take Diclofenac 75 mg, one tablet p.o. b.i.d. p.r.n. p.c."  (*Id.*)

### b.    Mental Impairments

In October of 2018, Patricia Fischer, CTRS[9] with Rochester Rehabilitation, in conjunction with Plaintiff, completed a Ventures PROS

---

[9] It appears that CTRS stands for a Certified Therapeutic Recreation Specialist.

Comprehensive Psychiatric Rehabilitation Assessment, stating, in relevant

part:

> Sleeps a lot and watches TV.  Needs to increase her structure.
> . . .
> She would like to make more friends.  She doesn't have many
> supports.
> She reports it is hard for her to interact with people.  She finds
> small talk to be hard.
> . . .
> Wants to connect to the YMCA.  She would be open to getting a
> volunteer job.
> . . .
> JaNae would like to finish her commercial electrician
> certification and gain work as an electrician (preferably in the
> union).  Outside of work, her primary values are her
> daughter/family and finding a sense of balance in her life.  In
> order to achieve her goals, JaNae will benefit from CRS groups to
> develop emotion regulation and consistency.  She can also work
> with ACCESS-VR and with the vocational team here at PROS to
> push herself forward in finishing her electrician certification.

(Tr. 47-48, 50.)

A PROS Individual Progress Note from **November 9, 2018** states, in

relevant part:

> During this review period [of October 15, 2018 through November
> 9, 2018], JaNae's attendance has been well below expectations.
> When she is here at PROS, JaNae does well.  She does tend to
> present as anxious, especially when she is running late.
> . . .
> JaNae identified the following goal areas: vocational (getting
> back to work), [l]iving ([h]ousing, [activities of daily living]).  Her
> life role goal will be finding balance and being an 'adult.'

(Tr. 58.)

On November 28, 2018, Plaintiff was involuntarily discharged from

27

Ventures PROS, Rochester Rehabilitation, for the following reasons:

> JaNae is currently unable to commit to a PROS schedule. She is
> in the process of adjusting her medications, and this has resulted
> in increased drowsiness and an inability to get to appointments
> in the morning. JaNae intends to complete this medication
> transition and build a more regular sleep schedule so she can
> commit further in the future.

(Tr. 53.) Up to that point, Plaintiff had received the following

services/treatment: basic living skills training, engagement, individual

recovery plan, structured skill development and support, and wellness self-

management. (*Id.*) The discharge summary stated, in relevant part:

> Mood dysregulation is JaNae's primary symptom. When
> depressed, she will isolate or sleep too much. When anxious or
> manic, she may forget her medication, be unable to concentrate,
> or sleep too little. When experiencing these symptoms, JaNae
> can manage them by reading or taking her medication. She
> utilizes resources like the library and the YMCA. She is also
> engaged with a therapist at Unity Pinewild.

(Tr. 55.) She did not report any medications, including over-the-counter

medications, at the time of discharge. (*Id.*)

On February 14, 2019, Ms. Montalbano completed a Mental RFC

Questionnaire regarding Plaintiff's condition. (Tr. 10-14.) She noted that

since 2013, Plaintiff had undergone medication management, individual

psychotherapy, group therapy, and had "difficulty with engagement and

compliance." (Tr. 10.) Plaintiff was diagnosed with cyclothymia and GAD.

(*Id.*) Her mental examinations were generally normal except for anxious

mood, restlessness, and poor eye contact.  (*Id.*)  Plaintiff's condition was
described as chronic with frequent periods of decompensation.  (*Id.*)
Plaintiff's symptoms included: anhedonia; appetite disturbance; decreased
energy; thoughts of suicide in the last year; blunt, flat or inappropriate affect;
feelings of guilt or worthlessness; impairment in impulse control at times;
generalized persistent anxiety; mood disturbance; difficulty thinking or
concentrating; apprehensive expectation; emotional withdrawal; intense and
unstable interpersonal relationships; emotional lability; flight of ideas; easy
distractibility; and sleep disturbance.  (Tr. 11.)

   Ms. Montalbano opined that Plaintiff was seriously limited in the
ability to: maintain attention for two-hour segments; sustain an ordinary
routine without special supervision; work in coordination with or proximity to
others without being unduly distracted; complete a normal workday and
workweek without interruptions from psychologically based symptoms;
perform at a consistent pace without an unreasonable number and length of
rest periods; accept instructions and respond appropriately to criticism from
supervisors; respond appropriately to changes in a routine work setting; deal
with normal work stress; set realistic goals or make plans independently of
others; and deal with the stress of semiskilled and skilled work.  (Tr. 12-13.)
Ms. Montalbano further opined that Plaintiff was unable to meet competitive
standards with respect to maintaining regular attendance and being

punctual within customary, usually strict tolerances.  (Tr. 12.)  She explained that Plaintiff had difficulty managing stress and struggled with routine and activities of daily living, such as attendance, managing and organizing tasks, checking mail, and other household tasks.  (Tr. 13.)

In addition, Ms. Montalbano opined that Plaintiff could not engage in full-time competitive employment on a sustained basis and she had a history of difficulty maintaining employment or schooling for a period of time.  (Tr. 14.)  Ms. Montalbano stated that Plaintiff's impairments had lasted or could be expected to last at least twelve months, and her limitations had been in existence for two or more years.  (*Id.*)

### 3.   The ALJ's Decision

The ALJ issued his decision on October 19, 2018.  (Tr. 41.)  At the outset, he stated: "Although informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative."  (Tr. 29.)

At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Tr. 32.)  At step two, he found that Plaintiff had the following severe impairments: osteoarthritis of the right shoulder, asthma, depression, anxiety, ADHD, personality disorder, and substance abuse.  (*Id.*)  The ALJ did not discuss any other impairments, severe or non-severe, at this

step. (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id.*)

Then, prior to step four, the ALJ found that Plaintiff had the RFC to perform a reduced range of light work.  (Tr. 34.)  Specifically, the ALJ limited Plaintiff to "unskilled work which is simple, routine and low stress, defined as having only occasional decision making, changes in work setting or interaction [with] others, and only occasional overhead reaching, crouching, crawling, or kneeling, within a clean air environment."  (*Id.*)  The ALJ summarized some of the pertinent evidence as follows:

> In a Disability Report – Adult completed in December 2015, the claimant was asked to list all conditions that limit her ability to work (Ex. 2E at 2).  The claimant listed anxiety, social phobia, depression, posttraumatic stress, and attention deficit hyperactivity disorders.  She did not list any physical impairments.[10]  However, in an updated disability report submitted in April 2016[,] the claimant reported that since filing the prior disability report her right shoulder had become very unstable and painful and that she had right knee pain and aching (Ex. 3E).  As a result of these musculoskeletal complaints[,] the claimant reported that she is not able to reach overhead and has problems doing her daily activities.  The claimant added that she had been scheduled for shoulder and knee surgery followed by physical therapy.
>
> The claimant testified to the following things.  She had right shoulder surgery in 2016 and right knee surgery in January

---

[10] On the same page of the form, Plaintiff reported she stopped working because she was "recovering from a back injury from repetitive lifting." (Tr. 235.) The ALJ does not seem to acknowledge this additional information.

2018.  She does not take any medications for pain relief.  . . .  She
has [ADHD] and a mood disorder.  She takes medication for
[ADHD].  She was taking Cymbalta for a mood disorder, but
stopped that medication because it made her feel lethargic.  She
sees a mental health therapist, but he is leaving and she will
soon transfer to a different therapist.  She is a single parent, and
lives with her ten[-]year[-]old daughter.  They have a cat and two
guinea pigs.  On a typical day, she makes breakfast, gets her
daughter up and off to school, and then attends classes full time.
She is studying to become an electrician.  The training involves a
great deal of "hands on" activity, including bending, twisting
wires, squatting, kneeling, and lifting up to 30 pounds.  After
school, she cooks dinner and watches about three hours of TV.
She also does household chores, but her house is cluttered.  . . .
Going to school is exhausting, and as a result she does not read
novels or do arts and crafts as often as she did in the past.  She
has a driver's license and does drive short distances.

Notably, when testifying[,] the claimant did not describe any
particular exertional or postural activity limitations secondary to
musculoskeletal or respiratory impairments.  However, she did
describe engaging in a wide variety of physical[ly] demanding
daily activities.

(Tr. 34-35.)

The ALJ also summarized the pertinent medical evidence regarding

Plaintiff's physical conditions as follows:

Records from Unity Hospital establish that the claimant
underwent right shoulder arthroscopic surgery to treat a Bankart
lesion and address instability on April 25, 2016 (Ex. 4F at 3), and
had right knee arthroscopic surgery on January 29, 2018, during
which the claimant was found to have extensive synovitis but no
meniscal tears (Ex. Id. at 26-27).  Although those surgical
procedures are documented, and do add support for the subjective
complaints of right shoulder and right knee pain made by the
claimant in the disability report she submitted with her appeal,
the record does not contain any postoperative treatment records
from primary care or orthopedic providers.

. . .

Although there are no treatment records from a primary care provider documenting office visits, appreciated clinical findings, and actual medical treatment, Chrystal Jenkins, M.D., was identified by the claimant as her primary care provider, and her name does appear on some medical reports (see for example, Ex. 2F at 2). In June 2017, Dr. Jenkins completed a medical report in connection with the claimant's application for vocational rehabilitation services, in which she reported that the claimant is status post right shoulder surgical repair and has moderate persistent asthma (Ex. 3F at 9-10). Dr. Jenkins further reported that the claimant has mildly restricted right shoulder range of motion and difficulty lifting heavy weights, and should avoid activities requiring repetitive motion and avoid exposure to dust, fumes and chemicals. Dr. Jenkins added that she expects that the claimant's shoulder to improve and remain stable secondary to physical therapy. While the undersigned has considered the information and opinions provide[d] by Dr. Jenkins[,] he notes that [the] record is devoid of any medical reports from Dr. Jenkins documenting the claimant's contemporaneously reported subjective complaints, appreciated clinical findings, or the use of medications and other treatment modalities. Furthermore[,] there are no records documenting treatment with physical therapy. The absence of these things detracts from the persuasive value of the doctor's opinions. However, considering the documented course of medical treatment with two orthopedic surgeries performed in an attempt to improve functioning, the course of inpatient treatment for a single asthmatic exacerbation, and the claimant's self-described physically demanding daily activities, and after giving maximum credit to the claimant's subjective complaints, the undersigned finds that the claimant retains the physical [RFC] to perform light exertional work in a clean air environment. He finds that the claimant is able to stand and walk for six hours per workday, sit for six hours per workday, and lift and carry twenty pounds occasionally.

(Tr. 35-36.)

Further, the ALJ summarized the pertinent medical evidence

33

regarding Plaintiff's mental conditions as follows:

> The record indicates that the claimant could have difficulty with detailed or complex tasks, constant contact with others, frequent workplace changes, and work performed at a fast pace or requiring high production goals due to symptoms of depression and anxiety, and problems sustaining attention and concentration and avoiding distractions.  However, the evidence supports that the claimant is capable of performing unskilled work, which is simple, routine and low stress, defined as having only occasional decision making, changes in work setting or interaction with others.

> Treatment records from mental health care providers at Unity Mental Health cover the period from December 2015 through June 2018, and show that the claimant received both mental health counseling and medication management for anxiety, depressive, and posttraumatic stress disorders (Ex. 1F and 5F). . . . Over the course of treatment, the claimant endorsed symptoms of flashbacks, nightmares, paranoia, irritability, problems sustaining attention and concentration, and difficulty managing her time effectively.  . . .  While treatment records do show that the claimant has some significant psychological symptoms, they also show that the claimant has had a good response to medication and counseling.  Although the claimant sometimes appeared distractible and anxious, clinical findings recorded during repeated mental status examinations were generally unremarkable . . . .  The claimant told mental health care providers that she wanted to improve her organizational skills, develop good coping skills, continue her education, and "further herself with a job and getting out of the neighborhood" (Ex. 5F at 56).  In March 2016, licensed social worker, Jessica Montalbano, reported that the claimant was making good progress towards meeting her treatment goals, and at an appointment one year later in March 2017, the claimant reported that she felt positive about therapy and that it is helpful (Id. at 28 and 99).  Although the claimant sometimes complained about difficulty keeping her house clean, she reported making good and steady progress managing other daily responsibilities.  For example, when seen in May 2017, the claimant reported that that [sic] working three days a week at Foodlink as part of her Work

34

Experience Program (WEP) was "going well" and that she felt "positive" about her ability to manage work, school, and child rearing responsibilities (Id. at 111). . . .

Although the claimant describes herself as having trouble sustaining attention and concentration, organizing things, managing her time, and keeping a schedule, she actually describes engaging in a wide variety of exertionally and mentally demanding activities of daily living. She attends school full time and is studying to become an electrician, which is a skilled occupation. She is a single parent and takes care of her school aged daughter independently. She cooks, cleans, does laundry, shops, and drives. She travels to and vacations in Florida. She takes care of her cat and two guinea pigs. She interacts with her professors, family members, and her boyfriend and his family. After the alleged onset date, she worked at Autosales Incorporated and she also worked at Foodlink as part of her WEP. While that work activity did not rise to the level of substantial gainful activity, it demonstrates significant ability to handle the mental demands of work activity, including the ability to interact with others in a work setting.

(Tr. 36-38.)

The ALJ then summarized Ms. Montalbano's June 2017 medical report

and gave it "some weight." (Tr. 38.) He explained:

This is because Ms. Montalbano is the claimant's own mental health care therapist, has clinically interviewed and evaluated the claimant on multiple occasions, and her opinions are well supported by the mixed clinical findings she recorded, which as noted, show that the claimant had some symptoms of anxiety and depression, but nevertheless, demonstrates intact insight, judgment, memory, and thought processes, as well as full orientation, normal speech, appropriate behavior and eye contact, and good grooming.

(*Id.*)

The ALJ also addressed Dr. Jenkins's June 2017 medical report as

35

follows:

> In the medical report completed in June 2017, Dr. Jenkins, the
> claimant's primary care provider, . . . reported that the claimant
> has a generalized anxiety and [ADHD], should avoid stressful
> social interactions, and would struggle with anxiety and panic if
> taking public transportation (Ex. 3F at 9-10).  The undersigned
> notes that the claimant has a driver's license, drives to stores,
> doctor's office, and school, and travels out of state for vacations.
> Thus, the limitations Dr. Jenkins proposed against using public
> transportation would not substantially limit the claimant's
> ability to attend work on a regular and continuing basis.
> Furthermore, as discussed earlier, the undersigned has
> considered the information and opinions provide[d] by Dr.
> Jenkins, but notes that the record does not contain any treatment
> notes from Dr. Jenkins documenting the claimant's subjectively
> reported symptoms, clinical findings appreciated during
> examinations, or the course of medical treatment provided by Dr.
> Jenkins.  Once again, the undersigned finds that the absence of
> these things detracts from the persuasive value of the doctor's
> opinions, which are consequently given little probative weight.

(*Id.*)

In summary, the ALJ stated that he "considered the entire record,

including statements made by the claimant at various junctures; the

claimant's wide range of daily activities; the clinical examination findings;

the course of surgical and mental health treatment; the use of medications;

and the opinion evidence." (Tr. 38-39.)  The ALJ stated:

> All of these things suggest greater sustained capacity than
> alleged by the claimant.  Although the [ALJ] does not doubt that
> the claimant may experience some difficulties secondary to her
> impairments, he finds no evidence that it is of such frequency,
> intensity or duration as to render the claimant incapable of
> performing substantial gainful activity at the level assessed in
> this decision.

(Tr. 39.)

Then, at step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a home health aide. (*Id.*) At the fifth and final step, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as a marker, an office helper, and a mailroom clerk, all of which are unskilled, light exertional jobs. (Tr. 40.)

### 4.   Analysis

A claimant is generally allowed to present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). "The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if 'the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" *Id.* (internal citation omitted). Evidence is chronologically relevant if it relates to the period on or before the date of the ALJ's decision. *See id.* Evidence is "material" when it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987) (quotations omitted). "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider

whether that new evidence renders the denial of benefits erroneous."

*Ingram*, 496 F.3d at 1262.

Here, the ALJ held a hearing on June 25, 2018, at which Plaintiff appeared in person, but was not represented by counsel. (Tr. 111.) On October 19, 2018, the ALJ issued his decision finding Plaintiff not disabled. (Tr. 29-41.) While this matter was on appeal to the Appeals Council, Plaintiff, with the assistance of an attorney, submitted the following evidence: (1) Ms. Montalbano's February 14, 2019 Mental RFC Questionnaire; (2) a Ventures PROS Comprehensive Psychiatric Rehabilitation Assessment, dated October 5, 2018, from Rochester Rehabilitation; a Ventures PROS Discharge Summary, dated November 28, 2018; and a PROS Individual Progress Note, dated November 9, 2018; (3) treatment records for the period January 9, 2015 through October 30, 2018 from Dr. Ciszewski. (Tr. 9-14, 46-108.)

On January 28, 2020, the Appeals Council denied Plaintiff's request for review of the ALJ's October 19, 2018 decision. (Tr. 1-6.) The Appeals Council did not exhibit the newly submitted evidence because it found the evidence did not show a reasonable probability that it would change the outcome of the decision. (Tr. 2.)

The Court finds that the new evidence submitted to the Appeals Council is chronologically relevant because most, if not all, of the evidence

relates to the period on or before the date of the ALJ's October 19, 2018 decision. The Court further finds that this new and chronologically relevant evidence is material because there is a reasonable possibility that it would have materially affected the administrative decision.

Specifically, the new and non-cumulative evidence includes multiple treatment records from Dr. Ciszewski regarding Plaintiff's right shoulder and right knee impairments both preceding and following her surgeries (*see* Tr. 65-67, 74-75, 90-92, 94-95, 100, 105-08), undermining the ALJ's statement that "the record does not contain any postoperative treatment records from primary care or orthopedic providers" (Tr. 35). In addition, the new and non-cumulative evidence demonstrates that Plaintiff underwent a right shoulder injection under fluoroscopic guidance on March 17, 2016 and two MRI diagnostic tests on the same day, showing tearing of the anterior/inferior labrum of the right shoulder and tearing of the posterior horn of the medial meniscus and chronic complete tear of the anterior cruciate ligament of the right knee. (Tr. 69-70, 72.) The evidence also includes Plaintiff's December 5, 2017 right knee MRI, showing "tears in the posterior horns of both medial and lateral menisci" and "a chronic ACL tear." (Tr. 99.) This is significant because such evidence seems to undermine the ALJ's statement that there were no records of actual medical treatment and clinical findings, other than the surgical reports, with respect to Plaintiff's right shoulder and right knee

impairments.  (Tr. 36.)  The ALJ also cited the lack of records of actual medical treatment and clinical findings when he evaluated Dr. Jenkins's June 2017 medical report.  (*Id.*)

Further, in the course of treatment for her right shoulder and right knee impairments, Plaintiff was told to avoid certain activities of which the ALJ was unaware when he assessed the RFC.  (*See* Tr. 66 (advising Plaintiff to avoid pivoting and twisting activities and any competitive upper extremity sports); Tr. 67 (advising Plaintiff to avoid competitive type sports); Tr. 83 (advising Plaintiff to avoid heavy lifting for six weeks); Tr. 90 ("[N]o active use of the shoulder yet.  . . .  No heavy lifting or carrying activities whatsoever.  . . .  Recovery time usually spans six months to a year."); Tr. 91 (advising Plaintiff to use a sling when in public, to perform gentle stretching exercises, and to avoid reaching above the shoulder level, carrying activities, and any heavy repetitive lifting); Tr. 95 (advising Plaintiff to avoid above-shoulder reaching and no lifting over 50 pounds); Tr. 97 (advising Plaintiff to avoid all above-shoulder reaching and carrying activities and no lifting over ten pounds for at least six months); Tr. 98 (advising Plaintiff to avoid pivoting and twisting activities); Tr. 100 (advising Plaintiff to avoid pivoting and twisting activities); Tr. 105 ("No work for now."); Tr. 106 ("No work or school for now.").)  This is important, particularly because the record before

the ALJ did not include any opinion evidence,[11] even though the ALJ stated

that he considered "the opinion evidence" along with other parts of the

record.[12]  (Tr. 38-39.)  Although the Court cannot speculate what weight the

ALJ may assign to the new evidence submitted to the Appeals Council, based

on the foregoing, there is a reasonable possibility that this evidence, alone or

when considered with the rest of the file, could change the outcome in this

---

[11] Ms. Montalbano's February 14, 2019 Mental RFC Questionnaire was submitted to the Appeals Council.  Even though this evidence was rendered after the ALJ's decision, Ms. Montalbano stated that Plaintiff's limitations described in the Questionnaire had been in existence for two or more years.  (Tr. 14.)

[12] The lack of opinion evidence is an additional reason warranting a remand in this case because this is not a case "where the medical evidence shows relatively little physical impairment [that] an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (per curiam); *see also Hunter v. Colvin*, No. 7:13-cv-2142-VEH, 2015 WL 770432, *6 (N.D. Ala. Feb. 24, 2015) ("An ALJ is allowed to make some judgments as to residual physical functional capacity where so little physical impairment is involved that the effect would be apparent to a lay person. . . . [H]aving undergone surgery and years of medical treatment, Hunter's condition is not a simple one that an ALJ can evaluate without the benefit of a medical source statement.") (internal citations and quotation marks omitted); *Palmore v. Colvin*, No. 4:13-cv-322-MHH, 2014 WL 3543701, *2-4 (N.D. Ala. July 15, 2014) (finding the ALJ's RFC determination was not supported by substantial evidence where the record contained no medical source statement or physician's physical capacities evaluation, because the evidence did not suggest relatively little physical impairment or that plaintiff's impairments were less complex); *McCright v. Colvin*, No. 4:13-cv-1206-VEH, 2014 WL 1513290, *5 (N.D. Ala. Apr. 11, 2014) ("When an ALJ makes an RFC determination about a claimant who, like Mr. McCright, has a complex medical history and who suffers from several severe impairments, he should have the benefit of a supporting medical source statement or a physical capacities evaluation from an examining physician.  Without that medical expertise, he risks substituting his own medical judgment for that of a physician and lacks substantial evidence to support his disability determination.").

41

case.  Therefore, this case will be reversed and remanded for further proceedings.

Accordingly, it is **ORDERED**:

1.      The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the newly submitted evidence, and conduct any further proceedings deemed appropriate.

2.      The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on August 6, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record